<u>NOT FOR PUBLICATION</u>

**United States District Court**
**for the District Of New Jersey**

| | |
|---|---|
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, COMMERCE STREET INVESTMENTS, LLC, PRU ALPHA FIXED INCOME OPPORTUNITY MASTER FUND I, L.P., PRUCO LIFE INSURANCE COMPANY,  PRUCO LIFE INSURANCE COMPANY OF NEW JERSEY, THE PRUDENTIAL LIFE INSURANCE  COMPANY, LTD., PRUDENTIAL RETIREMENT INSURANCE AND ANNUITY COMPANY and PRUDENTIAL TRUST COMPANY, | |
| Plaintiffs, | |
| vs. | |
| CREDIT SUISSE SECURITIES (USA) LLC (f/k/a CREDIT SUISSE FIRST BOSTON LLC), CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP., ASSET BACKED SECURITIES CORPORATION, and DLJ MORTGAGE CAPITAL, INC., | Civil No.: 12-7242 (KSH) <br><br> <u>Opinion</u> |
| Defendants. | |

<u>**Katharine S. Hayden, U.S.D.J.**</u>

**I.      Introduction**

Prudential Insurance Company of America ("Prudential") and certain of its affiliated

entities (collectively, "plaintiffs") sued Credit Suisse Securities (USA) LLC ("Credit Suisse")

and certain of its affiliated entities (collectively, "defendants") for allegedly making material

misrepresentations and omissions in connection with the sale of residential mortgage backed

1

securities ("RMBS"[1]).  Plaintiffs alleged that defendants' misconduct—which was detailed in a 200-plus-page complaint containing 674 numbered paragraphs and multiple exhibits excerpting the purported untruths—sounded under New Jersey common-law fraud (both legal and equitable, including a separate aiding and abetting count), fraudulent inducement, negligent misrepresentation, and the New Jersey civil Racketeer Influenced and Corrupt Organizations Act ("NJRICO," N.J. Stat. Ann. § 2C:41-1 *et seq.*).  Plaintiffs are seeking both monetary and injunctive relief.

Presently before the Court is defendants' motion to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6).  Defendants contend that the complaint fails adequately to set forth any actionable claims, and specifically that plaintiffs have failed to plead a material misstatement or omission.  Attached to defendants' motion are exhibits that supplement and contextualize those excerpts submitted by plaintiffs.

During oral argument, plaintiffs' counsel noted that "this motion does not come to this Court on a blank slate."  (Tr. MTD Hrg. 22:3.)  Counsel is correct.  Even a cursory search reveals substantial litigation involving RMBS, with each case presenting an array of complex financial instruments and relationships that shapes its course.  After considering the written and oral submissions, the Court agrees with plaintiffs that "this case is about specific statements made in specific offering documents about specific securities."  (Tr. MTD Hrg. 25:13–15.)  For that reason and others explained below, defendants' motion to dismiss the complaint is denied.

## II.   Factual Background

The following facts taken from the complaint are deemed true for the purposes of deciding the motion and do not represent factual findings.  *See Animal Sci. Prods. v. China Minmetals Corp.*, 654 F.3d 462, 469 n.9 (3d Cir. 2011).

---

[1] The Court will be omitting the extra "s" when referring to the plural collection.

On several occasions between 2004 and 2008, plaintiffs purchased approximately 83 RMBS securities from defendants for about $460 million.[2]  RMBS are financial instruments built from thousands of mortgage loans, which—after combinations, transfers, and other processing— are sold to investors by financial institutions in the form of "mortgage pass-through securities," known also as certificates.  The certificates represent interests in pools of mortgage loans, allowing the investors to receive mortgage payments paid by the underlying borrowers.  (Compl. ¶ 48 [D.E. 1].)

According to the complaint, creating these pass-through securities involves a few essential steps.  First, loans are made to a current or potential homeowner by a loan originator, who often funds the loans through a "warehouse" line of credit that is supplied by a financial institution known as a "sponsor" or a "seller."  The originator then transfers the loans to the sponsor, who pools thousands of them.  At that point, the sponsor transfers the pool to a "depositor," a bankruptcy-remote entity affiliated with the sponsor that is created solely to receive and transfer the rights to the loans.  The depositor transfers the pool to an "issuing trust," at which point the depositor securitizes the pool by dividing it into several tranches,[3] each of which corresponds to a different level of risk and reward.  In exchange for the mortgages, the trust provides the depositor with certificates that represent interests in the trust.  The depositor issues the certificates to underwriters, who in turn sell them to investors.  (Compl. ¶¶ 49–52.)

Because RMBS are built from mortgage loans, their risk is tied to the quality of the underlying loans.  First-hand information about a loan is contained in a "loan file" that

---

[2] The complaint alleges that that the purchases amounted to $466 million.  On August 2, 2013, the parties filed a stipulation of dismissal as to one of the named plaintiffs, Prudential Investment Portfolios 2, which had purchased one certificate valued at $5.5 million.  (Compl., Ex. B-3.)

[3] The "tranch" system has been defined as a "hierarchical priority system for distributing the available funds among the different classes of certificate holders."  *In re Oakwood Homes Corp.*, 449 F.3d 588, 610 n.27 (3d Cir. 2006).

originators create when assessing a mortgage-loan application.  According to the complaint, the loan file usually consists of:

- the borrower's application;

- documents that are supposed to verify the borrower's income, assets, and employment;

- the borrower's references;

- the borrower's credit reports;

- an appraisal of the property that will secure the loan and provide the basis for measures of credit quality, such as loan-to-value ratios;

- a statement of the occupancy status of the property; and

- other documents provided by the borrower to the originator.

(Compl. ¶ 54.)  However, RMBS investors like plaintiffs are not given access to the actual, individual loan files.  Instead, underwriters provide investors with "offering materials" that disclose aggregate information about the securities and the underlying loans.  (Compl. ¶ 55.)

Defendants, a "vertically integrated operation" (Compl. ¶ 71), were involved in several aspects of the securitization process related to the certificates purchased by plaintiffs.  Credit Suisse underwrote all of them and, as such, managed their sale to plaintiffs and was a key participant in writing the offering materials.  DLJ Mortgage (another named defendant and a Credit Suisse affiliate) was the sponsor for several of the securitizations and originated some of the underlying loans.  For each securitization in which it acted as a sponsor, DLJ chose either defendant Credit Suisse First Boston Mortgage Securities Corp. or Asset Backed Securities Corporation to be the depositors.  (Compl. ¶¶ 76–77.)

Plaintiffs allege that this vertical integration allowed Credit Suisse and its affiliates to "exercise[] complete control over virtually every step of the securitization process."  (Compl. ¶¶ 71–83, 89.)  Defendants could evaluate the quality of the underlying mortgage loans because defendants conducted or managed due-diligence reviews of samples of the loan pool.

4

Originators provided reviewers with "loan tapes," consisting of numerical data about a loan along with the underlying loan files.  The reviews were intended to ensure that the figures on the loan tapes were justified and that the loans complied with the originators' underwriting guidelines as well as defendants' own credit policies.  Defendants' due diligence was conducted both in-house and by third-party firms such as Clayton Holdings, Inc. ("Clayton"), which graded each loan that it reviewed and regularly provided defendants with reports containing quantitative and qualitative information.  (Compl. ¶¶ 90, 221, 416, 529, 559.)

In the last several years, a substantial number of borrowers became delinquent on their mortgage payments or defaulted, causing the credit ratings and values of the certificates to plummet.  Plaintiffs allege they have suffered significant losses because they purchased the Certificates "not only for their income stream, but also with an expectation of possibly reselling the Certificates on the secondary market."  (Compl. ¶ 569.)

The gravamen of the complaint is that the offering materials falsely portrayed the certificates as relatively safe investments backed by loans that were made in accordance to specific underwriting guidelines and possessed certain credit-enhancing characteristics.  In reality, plaintiffs contend, many of the underlying loans were made without regard to quality, all to maximize quantity.  And contrary to the descriptions provided in the offering materials, many of the loans were risky and the certificates of low quality.

As indicated, the complaint is over 200 pages and details how the mortgage-lending industry qualitatively deteriorated in the run-up to the financial crisis, which was when plaintiffs made the purchases.  Plaintiffs allege the focus of the industry shifted from an "originate to hold" model, where banks earned revenue through mortgage borrowers' interest payments, to an "originate to distribute" model, where the various players in the securitization process earned fees and shed risk by selling the loans.  Because under this model, quantity and not quality

earned revenue, financial institutions like defendants made and distributed loans without regard to borrowers' ability to repay. (Compl. ¶¶ 58–60.) As support, plaintiffs refer to testimony and documents from the Financial Crisis Inquiry Commission's (FCIC) investigation, allegations taken from other RMBS-related lawsuits against Credit Suisse, interviews with witnesses who worked for defendants and with their due diligence reviewers, and the results of their analysis of 18,400 of the underlying loans. (*See, e.g.*, Compl. ¶¶ 159–69.)

### III.   Jurisdiction and Standard of Review

The Court has jurisdiction over these state-law claims pursuant to 28 U.S.C. § 1332(a)(1).[4] *Washington v. Hovensa LLC*, 652 F.3d 340, 344 (3d Cir. 2011).

The Court must consider whether plaintiffs have satisfied their pleading obligations under the Federal Rules of Civil Procedure, standards which "have seemingly shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). When considering a motion to dismiss, a court must "accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Id.* at 210–11. If those factual allegations, as well as reasonable inferences drawn therefrom, fail to make out a claim that is plausible—one that leads to the reasonable inference that the defendants are liable for the misconduct alleged—the Court must dismiss the complaint. *Id.* Determining what is plausible is a "context-specific task that requires the reviewing court to draw on its judicial

---

[4] Plaintiffs asserted that defendants, as Delaware corporations, were diverse from plaintiffs. One of the named plaintiffs, Prudential Investment Portfolios 2, was a "Delaware statutory trust with a principal place of business at Gateway Center Three." (Compl. ¶ 25.) In this Circuit, "the citizenship of both the trustee and the beneficiary should control in determining the citizenship of a trust." *Emerald Investors Trust v. Gaunt Parsippany Partners*, 492 F.3d 192, 205 (3d Cir. 2007). The Court need not determine whether this plaintiff affects the required complete diversity because the parties stipulated to the dismissal of the sole claim brought by Prudential Investment Portfolios 2. (*See* Aug. 6, 2013 Order [D.E. 84].) *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 414 (3d Cir. 2010); *Safar v. Cox Enterprises, Inc.*, No. 10-3069, 2013 WL 4084636, at *3 n.3 (D.N.J. Aug. 12, 2013) (Linares, J.).

experience and common sense." *Id.* at 211 (citation and quotation omitted). "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the . . . claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

Plaintiffs have alleged fraud and related counts, and the federal rules require that such allegations be pled with particularity. *See* Fed. R. Civ. P. 9(b); *Lum v. Bank of Am.*, 361 F.3d 217, 220 (3d Cir. 2004) (explaining that "all claims based on fraud" must be pleaded in accordance with Fed. R. Civ. P. 9). That is, plaintiffs must "plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into [the] allegation." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007). Courts have also described this rule as requiring articulation of the "who, what, when, where, and how" of the purported fraud. *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). Although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally," Fed. R. Civ. P. 9(b), "the complaint must still contain more than a conclusory allegation, and the pleading must meet the less rigid—though still operative—strictures of [Fed. R. Civ. P. 8]." *Gotthelf v. Toyota Motor Sales, U.S.A., Inc.*, No. 12-2871, 2013 WL 2169403, at *7 n.15 (3d Cir. May 21, 2013) (nonprecedential).

"When a federal district court exercises diversity jurisdiction, it must apply the substantive law as decided by the highest court of the state whose law governs the action." *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1373 n.15 (3d Cir. 1996). The parties do not dispute that New Jersey law should be applied.

**IV.   Analysis**

Plaintiffs have grouped their claims into different causes of action.

A. <u>Fraud</u>[5]

The elements of fraud under New Jersey law are: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610 (1997). "Misrepresentation and reliance are the hallmarks of any fraud claim, and a fraud cause of action fails without them." *Banco Popular N. Am. v. Gandi*, 184 N.J. 161, 174 (2005) (citing *Gennari*, 148 N.J. at 610). Defendants challenge plaintiffs' pleading of each element.

1. <u>Whether the Alleged Misrepresentations and Omissions are Actionable</u>

Plaintiffs allege that defendants made material misrepresentations and omissions in the following ways:

- <u>Underwriting Standards</u>: The originators did not underwrite loans in accordance with the underwriting standards described in the offering materials. Rather, loans were made without consideration of borrowers' repayment ability. (Compl. ¶ 106.)

- <u>Due Diligence</u>: The offering materials omitted that defendants manipulated the due diligence process by regularly and knowingly securitizing risky loans that should have been rejected for failing to comply with the underwriting guidelines. (Compl. ¶ 108.)

- <u>Owner-Occupancy Levels</u>: The offering materials overstated the percentage of loans that had been made to borrowers who intended to occupy the properties; this was material because an owner-occupied property is less likely to go into default. (Compl. ¶ 112.)

- <u>Appraisal Values, CLTV, and LTV Ratios</u>: Appraisals of the mortgaged properties were inflated in order to justify making loans and did not assess their value as collateral for the loans. The inflated property values altered the loan-to-value (LTV) and combined-loan-to-value (CLTV) ratios, which were also provided in the offering materials. (Compl. ¶¶ 116, 120.)

---

[5] Plaintiffs also alleged a fraudulent inducement claim (*see, e.g.*, Compl. ¶ 206), which is generally thought of as a contractual claim. *See, e.g.*, *Axelrod v. CBS Publ'ns*, 185 N.J. Super. 359, 367–68 (App. Div. 1982). As the parties appear to treat this claim as coterminous with the substantive fraud claim, the Court will proceed as they did and analyze it under the same rubric.

- <u>Chain of Title</u>: The offering materials represented that the issuing trusts had title to the mortgage loans and would be able to foreclose in the event of default. Plaintiffs allege that the trusts do not have title to many of the loans and that, even if they nominally do, the transfers are missing "key intervening assignments," rendering title invalid. (Compl. ¶¶ 10, 130.)

- <u>Credit Ratings</u>: Defendants provided false information concerning the loans to the credit-rating agencies and applied pressure to analysts, which resulted in the certificates obtaining falsely inflated credit ratings. (Compl. ¶¶ 135–36.)

Defendants contend that none of the allegations amounts to an actionable misrepresentation or omission. They address each specific misrepresentation and omission, and also make several general defenses. Those general defenses, which apply to all of the alleged misrepresentations, will be considered first.

    a. <u>General Defenses</u>

        i. <u>The Repurchase Provisions Do Not Disclaim Liability</u>

Defendants contend that the offering materials had "repurchase or substitute" provisions, which warranted that if the trustee became aware of a loan in the pool that did not conform to the offering materials' descriptions, it had the right to request that the loan be repurchased or substituted with a conforming one. On that basis, defendants argue that the offering materials "made clear that no absolute representations were being made about the characteristics of the underlying loans," but rather disclosed the very real possibility that non-conforming loans might be securitized. (Defs.' Reply Br. 1 [D.E. 46].) This, they contend, demonstrates that the offering materials did not contain any material misrepresentations.

Defendants claim to find support for this position in *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383 (5th Cir. 2010). There, plaintiff Lone Star had purchased securities issued by two trusts and alleged that "contrary to [defendant] Barclays' representations, the BR2 and BR3 Trusts had a substantial number of delinquent loans." *Id.* at 386. Lone Star had discovered the deficiencies "[s]hortly after [its] purchases"; Barclays, upon

being challenged by Lone Star, "admitted that 144 of the mortgages were delinquent and promptly substituted new mortgages to replace any that were still delinquent." *Id.*

The court concluded that the repurchase-or-substitute provisions in the offerings protected Barclays from fraud liability. Lone Star's fraud claims, according to the court, were "predicated upon Barclays' alleged misrepresentation that there were no delinquent loans" in the trusts. *Id.* at 388. The court reasoned that "Barclays did not represent that the . . . mortgage pools were absolutely free from delinquent loans at the time of purchase," and, therefore, it had not made the alleged misrepresentations. *Id.* at 389–90. "The agreements envision[ed] that the mortgage pools might contain delinquent mortgages, and they impose a 'sole' remedy"—the repurchase-and-substitute process—"to correct such mistakes." *Id.* at 389. The court observed with approval that Barclays "fulfilled the repurchase or substitute obligations when Lone Star informed it of the delinquent mortgages in November 2007." *Id.*

*Lone Star* is distinguishable from this case. Plaintiffs have alleged fraud on the ground that the financial products defendants sold them were not produced in the manner described, and that defendants knowingly misrepresented that process as well as the characteristics of the products. Such allegations are of a different kind and degree than those at issue in *Lone Star*, proposing as they do repeated, inherent bad faith or obfuscation. Although this issue has not been addressed by the Third Circuit, many courts have decided that repurchase-or-substitute provisions are ineffectual to defend against these kinds of allegations. For example, in *City of Ann Arbor Employees' Retirement System v. Citigroup Mortgage Loan Trust Inc.*, No. 08-1418, 2010 WL 6617866 (E.D.N.Y. Dec. 23, 2010), the court distinguished *Lone Star* and denied defendants' motion to dismiss: "Unlike the claim in *Lone Star,* Plaintiffs here do not claim that the Trusts contain a small number of nonconforming loans. Instead, Plaintiffs here claim securities laws disclosure violations in the form of widespread misrepresentations regarding the

10

nature of the underwriting practices described in the offering documents." *Id.* at *7.  Several other courts have reached the same conclusion.  *See, e.g.*, *Dexia SA/NV v. Bear, Stearns & Co., Inc.*, No. 12-4761, 2013 WL 856499, at *5 (S.D.N.Y. Feb. 27, 2013); *Plumbers' & Pipefitters' Local No. 562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-1713, 2012 WL 601448, at *19 (E.D.N.Y. Feb. 23, 2012); *Stichting Pensioenfonds ABP v. Credit Suisse Grp. AG*, No. 653665/2011, 2012 WL 6929336, at *8 (N.Y. Sup. Ct. Nov. 30, 2012); *see also Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC*, 843 F. Supp. 2d 191, 201 n.7 (D. Mass. 2012) ("[C]ourts have refused to allow such clauses to defeat claims of the type of widespread misrepresentation alleged here."); *N.J. Carpenters Health Fund v. Residential Capital, LLC*, No. 08 CV 8781, 2011 WL 2020260, at *6 (S.D.N.Y. May 19, 2011) (noting that "the overwhelming majority of courts in th[e Second Circuit] have rejected the *Lone Star* approach").

This reasoning is persuasive.  Defendants cannot disclaim liability for the alleged wholesale deviation from the represented underwriting standards via disclosures intended to address what remedies a trustee has when it discovers a finite number of nonconforming loans.

### ii.    The Allegations Do Not Consist of "Fraud-by-Hindsight"

Defendants argue that the allegations focus primarily on the fact that the certificates have lost significant value, which amounts to nothing more than "fraud by hindsight."  (Defs.' Moving Br. 12 [D.E. 33-1].)   In other words, they maintain that plaintiffs have failed to plead that "any defendant knew any statement was false or misleading when made."  *Winer Family Trust v. Queen*, 503 F.3d 319, 331 (3d Cir. 2007).  Defendants cite to *In re Donald J. Trump Casino Securities Litigation—Taj Mahal Litigation*, 793 F. Supp. 543 (D.N.J. 1992) (Gerry, J.), *aff'd*, 7 F.3d 357 (3d Cir. 1993), where the court wrote that "failure of an investment is not intrinsically equatable with fraud in the offering of that investment."  *Id.* at 557.

11

While plaintiffs do allege that the certificates' precipitous drop in value is an indicator of fraud, they support their claims with several other sources, including statements of witnesses, internal emails, and their forensic statistical sampling of certain loans.  In contrast, the fraud claim in *Trump* was a "naked assertion unsupported by any factual allegations" other than the losses plaintiffs allegedly incurred.  *Id.*

The Court concludes that plaintiffs have not merely pleaded fraud by hindsight; that is, that because defendants "statements turned out to be wrong . . . [the statements] must have been fraudulent."  *Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009). Rather, they have pleaded sufficient facts, both contemporaneous and since-discovered, that allow the Court to plausibly draw the inference that defendants were aware of the falsity of their statements at the time they were made.  *See Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012) ("The touchstone of the pleading standard is plausibility.").  Hence, these allegations survive defendants' motion to dismiss.

### iii.   Whether the Allegations Are Sufficiently Linked to the Certificates

Defendants next argue that the allegations are not particular enough to satisfy Rule 9(b) analysis because they are not "linked" to the certificates.  (Defs.' Moving Br. 10–11.)  They challenge certain sources upon which plaintiffs rely as being irrelevant to the certificates.  At oral argument, counsel for defendants argued that what plaintiffs have done is "pull all of the random things about the general mortgage situations in the country.  And they try to pin it on Credit Suisse with respect to these particular securitizations," and "nothing stops them from bringing complaints against every securitization out there that they have purchased from."  (Tr. MTD Hrg. 13:16–18.)  Defendants mount the particularity defense in the context of each specific misrepresentation, and because context is important, the Court will assess below whether each

misrepresentation satisfies the particularity threshold, rather than making a generalized assessment.

The particularity requirement does not mandate that plaintiffs prove their case in the complaint. Rather, particularity is required "to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir. 1984); *see also Lum,* 361 F.3d at 223–24. And courts have held that, when defendants are insiders, "reference to an offering memorandum satisfies 9(b)'s requirement of identifying time, place, speaker, and content of representation." *Ouaknine v. MacFarlane*, 897 F.2d 75, 80 (2d Cir. 1990) (collecting cases); *accord Romani v. Shearson Lehman Hutton*, 929 F.2d 875, 880 n.4 (1st Cir. 1991) (citing *Ouaknine*, 897 F.2d at 80); *Abu Dhabi Commer. Bank v. Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 171 (S.D.N.Y. 2009) (same). Thus, the question of whether the allegations are sufficiently particular is not the same question as whether plaintiffs' allegations are bulletproof. Rather, the question is whether plaintiffs have provided a detailed description of what the alleged misrepresentations are and what materials support plaintiffs' contentions. This analysis follows.

b. Underwriting and Due Diligence Representations

The offering materials contain descriptions of the guidelines that originators would abide by when underwriting mortgage loans. For example, the offering materials associated with the "AABST 2004-2" set provided that the underwriting standards would "generally conform" to a process whereby the originator would take into consideration the borrowers' mortgage application, income and expenses, assets and liabilities, net worth, credit score, and other financial obligations, as well as the appraised value of the property (to determine the property's adequacy as collateral for the loan). (Compl., Ex. C-1.) According to the materials, these

criteria were used to evaluate whether a borrower's monthly income would be sufficient to enable him or her to meet the monthly mortgage payments and other property-related expenses. (Compl., Ex. C-2.)  And, generally, the guidelines would not permit a loan to be made if a borrower's obligations were above a certain percentage of his or her income.  (Compl., Ex. C-2.)  The document also discloses that the originators may make loans that do not meet the standard criteria "if the application reflects compensating factors."  (Compl., Ex. C-3.)

Plaintiffs claim these representations were false.  "In truth, loans were offered with virtually no regard for borrowers' actual repayment ability and the value and adequacy of mortgaged property that was used as collateral."  (Compl. ¶ 106.)  Plaintiffs also make the related but distinct claim that the defendants knowingly ignored red flags that were raised about loans during the due diligence process and proceeded to securitize them.  (Compl. ¶¶ 107–09.)  Defendants attempt to show the insufficiency of these allegations on four grounds.

First, defendants contend that the offering materials did not provide that the underwriting guidelines would be strictly applied.  Instead, the offering materials disclosed that loans could and would be originated outside of the stated guidelines as long as they *substantially complied* with the guidelines and did not limit the number of exceptions that would be made.  (Defs.' Moving Br. 13–14.)  But this argument misses the mark.  Plaintiffs explicitly allege that "the underwriting guidelines were systematically abandoned, without regard to whether 'compensating factors' were present."  (Compl. ¶ 410.)  Thus, even the representations about substantial compliance were allegedly false.  And courts have held that "'saying that exceptions occur' does not reveal what [plaintiffs] allege[], 'namely, a wholesale abandonment of underwriting standards.'"  *N. J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 125 (2d Cir. 2013) (citing *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 773 (1st Cir. 2011)).  The Court agrees.

14

Defendants' next three arguments relate to whether the underwriting allegations are sufficiently particularized.  Defendants attack certain facts upon which plaintiffs rely, contending they are irrelevant to plaintiffs' purchases and thus render their underwriting and due diligence allegations fatally flawed: (1) the certificates' current performance, (2) allegations from other lawsuits, and (3) a due diligence report that Clayton provided to the Financial Crisis Inquiry Commission.  (Defs.' Moving Br. 14–15.)  At oral argument, counsel for defendants added that the allegations are insufficient because they are "not specifically related to actual review of loan files here."  (Tr. MTD Hrg. 43:5–6.)

Defendants place too high a burden on plaintiffs at this stage.  Plaintiffs, who did not and still do not have access to the loan files, support their allegations with facts that relate both to the defendants generally *and* to the very certificates plaintiffs purchased.

For example, plaintiffs highlight the results of four non-party re-underwriting analyses of RMBS sold by Credit Suisse during the relevant time period.  (*See* Compl. ¶ 176.)  And the analyses not only paint a damning picture of defendants' securitization practice in general, but also involved one of the specific offerings at issue here.  To wit: in some of the underlying loans, defendants left unquestioned borrowers' unreasonable income and debt levels, as well as occupancy status.  (Compl. ¶ 184.)

Plaintiffs also rely on the fact that Clayton regularly provided defendants with due diligence reports that informed them of the nonconforming loans in the purchased loan pools. And the "Clayton Trending Report"—which Clayton submitted to the FCIC in connection with Clayton's September 2010 testimony—showed that between 2006 and 2007, "32% of the 56,300 loans Clayton reviewed for Credit Suisse received the worst possible grade, 'failed to meet guidelines,' and lacked any compensating features.  Yet, rather than doing anything to address these facially troubling rates, Defendants 'waived in' to its pools one-third of those toxic loans."

15

(Compl. ¶ 227 (emphasis omitted).)  Plaintiffs separately allege that various Clayton witnesses corroborated this data.

Plaintiffs also cite to documents that characterize many of the originators at issue here as "the worst of the worst" in terms of mortgage-lending practices.  (Compl. ¶¶ 231–354.)  As an example, plaintiffs comment on New Century Mortgage Corporation, which originated loans underlying five of the offerings:

> In December 2009, the SEC charged three of New Century's top officers with violations of federal securities laws. The SEC's complaint details how New Century's representations regarding its underwriting guidelines were false, including its purported adherence to high origination standards in order to sell its loan products in the secondary market.

(Compl. ¶ 247.)  New Century filed for bankruptcy in 2007 and its bankruptcy examiner found that it "had a 'brazen obsession with increasing loan originations, without due regard to the risks associated with that business strategy'" and "layered the risks of loan products upon the risks of loose underwriting standards in its loan originations to high risk borrowers."  (Compl. ¶¶ 239–40.)

Plaintiffs also plead that an inordinate portion of the loans are delinquent or in default.  In at least one trust, over half of the loans are in default.  Of the remaining trusts, delinquency rates reach as high as 49.34%; most are well above 30%.  (Compl. ¶ 171.)  Plaintiffs' forensic statistical sampling of 18,400 loans evenly spread across the offerings revealed that many of the properties were not owner-occupied and were highly leveraged—which, according to plaintiffs, were both telltale signs of riskiness and were contrary to what the offering materials described.  (*See, e.g.*, Compl. ¶ 140.)  As plaintiffs contend, "[t]he consistency and size of these misrepresentations . . . confirms that the abandonment of sound underwriting practices was systemic.  Loans actually put through the underwriting processes stated in the Offering Materials would not so consistently" have been misidentified.  (Compl. ¶¶ 148, 158.)

Significantly, district courts have sustained complaints with similar or fewer negative allegations.  In *Federal Housing Finance Agency v. JPMorgan Chase & Co*, 902 F. Supp. 2d 476 (S.D.N.Y. 2012) [hereinafter *FHFA*], the court denied J.P. Morgan's motion to dismiss an RMBS fraud claim.  There, plaintiffs used a similar array of source material as Prudential does here, and J.P. Morgan marshaled a similar linking defense.  *See id.* at 484.  The court acknowledged that descriptions of government and private investigations were "insufficient, alone, to permit a claim to be brought on any individual certificate."  *Id.* at 488.  But, the court continued, those allegations "provide a basis to assert that there was a systematic failure by the defendants in their packaging and sale of RMBS," and were linked to the certificates at issue by "the loan performance and credit-rating histories of the certificates."  *Id.*  Thus, the allegations survived Rule 9(b) scrutiny with respect to each of the 103 securitizations at issue.  *Id.* at 490.

Defendants try to distinguish *FHFA* because the defendants there had originated many of the underlying mortgages, and thus "they knew more about the mortgage situation."  (Tr. MTD Hrg. 7:23–24.)  But as discussed in more detail below, the complaint plausibly pleads that defendants here had an inside look at their originators' lending practices and were thereby sufficiently informed about the origination process.

In *Dexia*, a case from the Southern District of New York, the court denied defendants' argument that an RMBS fraud claim should be dismissed because the allegations were not sufficiently tied to the 51 securitizations at issue.  "[T]he Amended Complaint's allegations . . . present a picture of defendants' unsound mortgage origination and securitization practices so pervasive that a reasonable fact-finder could infer that those practices affected the securitizations at issue in this case."  *Dexia*, 2013 WL 856499, at *4.  In this District, the court denied Goldman Sachs's motion to dismiss a fraud claim brought by Prudential that is similar to this one.  *See*

*Prudential Ins. Co. of Am. v. Goldman, Sachs & Co.*, No. 12-6590, 2013 WL 1431680, at *7 (D.N.J. Apr. 9, 2013) (Wigenton, J.).

The Court finds that plaintiffs have met their burden in pleading an actionable misrepresentation with respect to the underwriting and due diligence misrepresentations.

### c.  Owner-Occupancy Levels

Plaintiffs allege that defendants engaged in misrepresentation by inflating the percentage of properties that borrowers intended to occupy.  Through their forensic statistical sampling analysis, plaintiffs were able to identify individual properties associated with the certificates and, using data contemporaneous with the transactions, test for characteristics that they claim are typically associated with owner occupancy.  For example, plaintiffs examined whether the borrowers' tax documents, credit records, and other financial records were mailed to the properties or elsewhere; whether the borrowers owned other properties; and whether the borrowers made conflicting residency representations in connection with other loans.  (Compl. ¶¶ 140–44.)  Plaintiffs allege that "[f]ailing more than one of the above tests is strong evidence the borrower did not in fact reside at the mortgaged properties."  (Compl. ¶ 146.)  They determined that the offering materials overstated the owner-occupancy rate by between 9.84% and 13.86%.  (Compl. ¶ 146.)

If true, material misrepresentations were made, and the dispositive question is whether they can be attributed to defendants.  Defendants argue this can't happen because the offering materials set forth that the owner-occupancy levels were based on the borrowers' representations, which defendants had not vetted.  (Defs.' Moving Br. 15–16.)  That argument has been persuasive in other cases.  For example, in *Union Central Life Insurance Co. v. Credit Suisse Securities (USA), LLC*, No. 11-2327, 2013 WL 1342529 (S.D.N.Y. Mar. 29, 2013), the court acknowledged that "[b]ecause the Offering Materials explicitly stated that all occupancy

rates were based only on borrowers' representations and because Plaintiffs do not allege that Defendants falsely reported the borrowers' representations, Plaintiffs have alleged no misstatements concerning owner-occupancy rates." *Id.* at *8. In *Footbridge Ltd. v. Countrywide Home Loans, Inc.*, No. 09-4050, 2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010),[6] the court dismissed a similar claim because, although plaintiffs alleged that defendants were aware of borrower fraud, those allegations were too conclusory. *Id.* at *9.

Plaintiffs here have alleged that defendants knew about the alleged misrepresentations. (Compl. ¶ 147; Pls.' Opp. Br 10–11 [D.E. 42].)  If defendants knew the representations were false, spreading the representations would be fraud.  Since knowledge is the dispositive question,[7] the Court will address the parties' contentions in the scienter section.

### d.   Appraisals & CLTV/LTV Ratios

Plaintiffs allege that defendants made misrepresentations concerning the appraisals of the properties and important statistics about the underlying loans—most significantly, the loan-to-value (LTV) and combined loan-to-value (CLTV) ratios.  "These ratios were material to Prudential and other investors because higher ratios are correlated with a higher risk of default." (Compl. ¶ 117.)  The offering materials represented that appraisals were performed for the

---

[6] The Court notes that *Footbridge* concerned a degree-of-risk complaint in which the plaintiffs specifically acknowledged that the loans underlying the purchased securities were less than ideal.  *See id.* at *4.

[7] Defendants raise two unpersuasive arguments.  First, they contend that the owner-occupancy representations concerned future actions—the borrowers' plans at the time they applied for the loans—not present or past facts, and, therefore, are not actionable under New Jersey law.  But statements of intent concerning future conduct are actionable if the speaker never harbored the intent to perform, which is what is alleged here.  *See Capano v. Stone Harbor*, 530 F. Supp. 1254, 1264 (D.N.J. 1982) (Gerry, J.).  Defendants also contend that plaintiffs' methodology for assessing owner occupancy is flawed because it used "records that did not exist at the time of loan origination [and] says nothing about accuracy of the disclosure at the time the borrowers' statements in the Offering Documents were made."  (Defs.' Moving Br. 17.)  But plaintiffs make clear that their results "draw from data largely contemporaneous with the transactions at issue," and, thus, can be used as indicia of whether the representations were true.  (Compl. ¶ 154.)

purpose of "determin[ing] the adequacy of the property as collateral." (*See, e.g.*, Compl., Ex. C-6.)  Some specified that the appraisals would conform to an industry standard, the Uniform Standards of Professional Appraisal Practice.  (Compl., Ex. F-1.)  Using the appraised value and the mortgage amount, defendants disclosed for a particular offering the percentage of loans that had an LTV ratio greater than 80%, 90%, and 100%, respectively. (*See, e.g.,* Compl., Ex. C-7.)

Plaintiffs allege that the appraisal process was manipulated so that loans would be approved without considering whether the underlying properties were adequate collateral for the loans.  (Compl. ¶¶ 115–16.)  Because this manipulation involved inflating property values, LTV ratios were consequently understated.  The offering materials, therefore, gave the impression that far fewer of the loans were highly leveraged or underwater than was the case, making the certificates appear to be safer investments than they were.

Defendants maintain that the claim should be dismissed because appraisals are statements of opinion that cannot be actionable unless the speaker knew them to be false when made.  (Defs.' Moving Br. 19.)  And the complaint, they argue, does not identify "any loan for which the appraised value was not believed *at the time of origination*."  (Defs.' Moving Br. 19 (emphasis in the original).)  This overlaps with another argument defendants make: that the allegations are not particular enough because they are not tied to the specific loans underlying the certificates and are "devoid of any factual support."  (Defs.' Moving Br. 20–21.)

The Court determines that plaintiffs have injected enough precision into these allegations to survive a motion to dismiss.  First, plaintiffs cite to sources that reflect that defendants' originators engaged in systematic fraudulent behavior.  For example, a former executive of the lender New Century testified before the FCIC that "appraisers 'fear[ed]' for their 'livelihoods' if they failed to provide New Century with a lofty valuation of their collateralized properties." (Compl. ¶ 248.)  A witness from another originator, Option One, said "during the appraisal

process, loan underwriters at Option One would call their 'appraiser friends' and communicate to the appraiser the requisite appraisal value for approval of the mortgage loan being underwritten."  (Compl. ¶ 255.)  The Massachusetts Attorney General filed suit against Option One because, among other things, "Option One's agents and brokers '. . .  inflated the appraised value of the applicant's home.'"  (Compl. ¶ 261.)  And a lawsuit filed by the New York Attorney General against two appraisers used by the originator WaMu revealed that WaMu pressured and "compromised the independence of appraisers."  (Compl. ¶¶ 279, 281–82.)

In addition, plaintiffs conducted independent appraisals of certain properties using an automated valuation model (AVM)—a mathematical model that uses "data similar to what appraisers use" such as "county assessor records, tax rolls, and data on comparable properties." (Compl. ¶ 152.)  Plaintiffs used data contemporaneous with the transactions, and they allege that the results establish that "the appraisal values used by Defendants were materially and consistently inflated" and "that the LTV and CLTV ratios were misrepresented at the time the representations were made."  (Compl. ¶¶ 153–54.)

Courts construing claims under the Fed. R. Civ. P. 8(a) pleading standard have found similar allegations of appraisal fraud to be adequately tied to the securities at issue.  In *Plumbers' & Pipefitters' Local No. 562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-1713, 2012 WL 601448 (E.D.N.Y. Feb. 23, 2012), the plaintiff relied upon statements from confidential informants and a survey of appraisers.  The district court acknowledged that the allegations were "not tied to specific individual loans underlying the Certificates" and characterized them as "not strong."  *Id.* at *13.  Yet, it nonetheless held that the complaint "describes sufficiently widespread conduct to plausibly infer that Certificates at issue were affected."  *Id.*  And in *Capital Ventures International v. J.P. Morgan Mortgage Acquisition Corp.*, No. 12-10085, 2013 WL 535320 (D. Mass. Feb. 13, 2013), the plaintiff

performed an independent appraisal using an AVM.  The court found that while "general allegations about the [appraisal] industry would not state a claim on their own," the plaintiff had "supported its claims with specific allegations about the originators and loans at issue.  Those allegations make its claim plausible."  *Id.* at \*5.  Recently, a New Jersey state court upheld a common-law fraud claim concerning appraisal fraud brought by Prudential, in part based on Prudential's  similar "data analysis."  *See Prudential Ins. Co. of Am. v. J.P. Morgan,* No. ESX-L-3085-12, slip op. at 32–33 (N.J. Super. Ct. Law Div., Jul. 18, 2013) [D.E. 60-1].

Because plaintiffs plead that the very originators here encouraged and engaged in appraisal fraud, and because plaintiffs allegedly uncovered consistent, material inaccuracies in the appraisals, the Court concludes that allegations are sufficiently linked to the certificates.[8] Moreover, in the Second Circuit a court has held that "loan-sampling results . . . are sufficiently suggestive of widespread inaccuracies in appraisal value to render plausible [plaintiffs'] claim that the LTV information reported in the offering materials was 'objectively false.'"  *Fed. Hous. Fin. Agency v. UBS Ams., Inc.*, 858 F. Supp. 2d 306, 328 (S.D.N.Y. 2012), *aff'd,* 712 F.3d 136 (2d Cir. 2013).

    e. <u>Chain of Title</u>

---

[8] Defendants raise two other objections.  The first is that the complaint does not specify how the actual appraisal processes purportedly deviated from those disclosed in the offering materials.  (Defs.' Reply Br. 8 [D.E. 46].)  But plaintiffs do: they allege that genuine appraisals were never done at all, and instead, values were generated solely to justify making a loan.  Any other detail would be unnecessary at this stage.  Defendants also defend against this claim on the basis that the offering materials disclosed that property values might differ from the appraised value.  (Defs.' Moving Br. 20.)  Such disclaimers are ineffective against allegations that the appraisal process was a sham.  "[A] warning that property values fluctuate over time is simply not the same as a warning that appraisal values have been systematically inflated."  *Capital Ventures*, 2013 WL 535320, at \*4.

The offering materials summarized the terms of "pooling and servicing agreements," or PSAs, which are contracts that govern the administration of RMBS trusts. The offering materials specifically disclosed that, pursuant to the PSAs, the depositor would assign the mortgages and transfer mortgage documents to the trustee. One set of offering materials provided that the "Pooling Agreement will require that, within the time period specified therein, the Depositor will deliver or cause to be delivered to the Trustee (or a custodian, as the Trustee's agent for such purpose) the Mortgage Loan Documents and the mortgage notes endorsed in blank or to the Trustee." (Compl., Ex. G-9.)

Plaintiffs contend that "title is a fundamental part of the securitization process" and, if title were not properly transferred, the trusts would be unable to foreclose on delinquent borrowers. (Compl. ¶¶ 130, 161.) Plaintiffs allege that the results of their forensic statistical review demonstrate that "[c]ontrary to their representations, Defendants did not properly assign large numbers of the Mortgage Loans to the Trusts." (Compl. ¶ 162.) Rather, many of the loans remained in the name of the originator or with a third party. (Compl. ¶ 165.) They allege too that several of the loans that were nominally in the trustee's name are missing "key intervening assignments." (Compl. ¶¶ 130, 162, 167.)

Defendants assert that the offering materials do not provide that the loans would be assigned *only* to the trustee. Rather, according to defendants, the materials included the possibility that loans would be assigned to the trustee's "nominee" or "custodian." (Defs.' Moving Br. 22.) Because the complaint fails to specify that the holders of the loans are not the trustees' custodians or nominees, defendants argue, it falls short of alleging an actionable misrepresentation.

Defendants fail, however, to respond to plaintiffs' allegation that over 55% of the loans have not been properly conveyed to the trusts because they are missing necessary intervening

assignments.  (Compl. ¶¶ 166–67.)  And defendants' contention that the representations are not actionable because they merely describe the terms of the PSA, to which investors were not a party, is unavailing; the offering materials represented what would occur pursuant to those agreements.

### f.   Disclosures Concerning the Certificates' Credit Ratings

The offering materials give the certificates' credit rating, which was obtained from credit-rating agencies.  Most obtained the highest possible ratings.  (Compl. ¶ 133.)  Plaintiffs allege that defendants knowingly gave rating agencies the same or similar inaccurate information that they gave to investors, which led to inflated ratings.  (Compl. ¶ 135.)

Defendants contend that ratings are statements of opinion that are not actionable under a theory of fraud.  But they either ignore or misconstrue the heart of the allegation: it is not that plaintiffs disagree with the "opinion," but that defendants knew the rating was based on inaccurate or false information.  Defendants cannot "repeat opinions they know are inaccurate or baseless and then disclaim liability."  *Capital Ventures*, 2013 WL 535320, at *6.

Defendants also argue that the allegations fail because they lack detail.  In their words, "[p]laintiffs do not . . . plead *what* allegedly false information was given; *when* it was given; or *how* it was used by the agencies."  (Defs.' Reply Br. 10 (emphasis in the original).)  But plaintiffs do plead what the false information was, namely the risk features that were also presented in the offering materials, such as LTV ratios and owner-occupancy levels.  (Compl. ¶¶ 135, 211–13.)

In sum, plaintiffs have adequately pleaded each materiality element pertaining to fraud that they alleged in the complaint.  Next, the Court must determine whether plaintiffs have successfully pleaded "knowledge or belief by the defendant of its falsity": the defendants' scienter.

2.  Plaintiffs Have Adequately Pled Scienter

Plaintiffs have the burden to plead generally that defendants knew that the alleged statements were false or misleading.  Fed. R. Civ. P. 9(b); *Gennari*, 148 N.J. 582 at 610. Defendants contend that the complaint is devoid of plausible allegations that defendants possessed this state of mind.

Specifically, defendants' position is that plaintiffs must identify a contemporaneous document or other source that would have put them on notice that their representations were inaccurate.  (Defs.' Reply Br. 10.)  They rely in large part on *Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.*, 478 F. App'x 679 (2d Cir. 2012)—a nonprecedential, per curiam summary order—in which the Second Circuit held that the plaintiff, who was alleging fraud in connection with an RMBS offering, had to make "an allegation that defendants had access to information that was inconsistent with their alleged misstatements [and] 'must specifically identify the reports or statements containing this information.'"  *Id.* at 681–82 (citation omitted). There, as here, plaintiffs were alleging that defendants had access to due diligence reports that put them on notice of the shoddy quality of the underlying loans.  *Id.* at 681.  But, in setting forth the requirements, the court noted that the only specific document identified in the complaint was the Clayton Trending Report, which was created *after* the security had been issued.  *Id.* at 682.[9] Thus, the Report could not be used as a basis for alleging defendants made a knowing misrepresentation at the time the defendants offered the security.  *Id.*  More recently, an opinion from the Southern District came to a similar conclusion.  *See Union Cent. Life Ins. Co.*, 2013 WL 1342529, at *9.

---

[9] The Second Circuit did not refer to the Clayton Trending Report by name, but the district court did.  *See Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.,* 821 F. Supp. 2d 616, 622 (S.D.N.Y. 2011).

Defendants challenge the forensic reviews as based on "after-the-fact-data" and not probative of defendants' state of mind at the time the certificates were issued.  As earlier indicated, they argue that plaintiffs have not identified any due diligence reports related to the certificates; that many allegations are conclusory and "lifted" from other complaints or public documents that have no connection to the certificates here; and that the witnesses with whom plaintiffs allegedly spoke are not alleged to have worked on the offerings at issue.  (Defs.' Moving Br. 26–28.)

Defendants' arguments fail.  Initially, it should be noted that the *Landesbank* court held its plaintiffs to the "strong inference" standard.  *Landesbank,* 478 F. App'x at 681.  But in the Third Circuit, intent need only be pled in accordance with the "strictures of Rule 8." *Gotthelf*, 2013 WL 2169403, at *7 n.15 (citation omitted).  The strong-inference standard has been reserved for securities cases brought under the Private Securities Litigation Reform Act, which "supersedes Rule 9(b)" for purposes of pleading intent. *In re Suprema Specialties, Inc. Sec. Litig.,* 438 F.3d 256, 277 (3d Cir. 2006) (citation omitted).  Also, in contrast to *Landesbank*, plaintiffs rely on several sources that, when considered together, are sufficient for purposes of pleading the knowledge element.  The Court will discuss them in turn.

a.  <u>Defendants' Alleged Scheme to Securitize Risky Loans</u>

Plaintiffs have alleged that defendants had a motive to securitize loans that did not conform to originators' underwriting standards, which is more nuanced than simply quantity over quality.  Intent "may be adequately alleged by setting forth facts establishing a motive and an opportunity to commit fraud." *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 318 (3d Cir. 1997).

According to the complaint, Credit Suisse acted as a warehouse lender to many of the originators.  It provided them with funds to make loans, and they in turn sold Credit Suisse the loans for securitization.  This financial relationship allegedly created a conflict of interest when it

26

came to reviewing the loans.  "If Credit Suisse refused to buy the proffered loans [because they failed to comply with underwriting guidelines] it could leave the originator unable to pay the warehouse loan and Credit Suisse holding the bag."  (Compl. ¶ 373.)  Moreover, Credit Suisse wanted to keep good relationships with their originators.  "As one Credit Suisse trader put it, the bank 'relax[ed] [its] underwriting criteria . . . to encourage loyalty . . . from originators.'"  (Compl. ¶ 376.)

### b.   Underwriting and Due Diligence Representations

Plaintiffs make several allegations raising a plausible inference that defendants knew the underwriting representations were false.  First, defendant DLJ originated some of the loans at issue.  (Compl. ¶ 37.)  Second, plaintiffs describe how defendants had an inside look at their originators' lending practices.  For example, before agreeing to provide a warehouse line of credit, Credit Suisse would subject originators' lending practices to "extensive due diligence"; and, after providing the credit line, Credit Suisse would receive regular reports from the originator about loans it had made.  (Compl. ¶ 73.)  Through this due diligence process, plaintiffs claim, defendants were given regular access to information about the loans defendants had purchased.  Defendants allegedly placed employees on-site at review centers, received real-time information about the reviews, and were regularly given diligence reports.

Statements made by witnesses demonstrate not only that defendants routinely received diligence updates, but also that defendants were aware of the endemic underwriting problems.  For example, a former Credit Suisse employee said that account executives at the bank pressured due diligence underwriters to approve loans even when the underwriters wanted to deny them because of "blatant fraud" by the borrower or originator.  (Compl. ¶ 409.)  Another Credit Suisse employee said that "[d]efendants turned a blind eye to blatant originator fraud," and a manager at the bank said that "the mentality was 'Credit Suisse was going to acquire the loans one way or

27

another, so we should just get the job done.'" (Compl. ¶¶ 405, 411.)  A former Clayton employee

remembered that Credit Suisse was "'eating up'" loans that failed to adhere to underwriting

guidelines.  (Compl. ¶ 413.)

These allegations meet the requirement that plaintiffs plead generally that defendants

knew about the alleged underwriting and due diligence misrepresentations.

      c.  <u>Owner Occupancy Misrepresentations</u>

As mentioned above, defendants contend they cannot be held liable for inaccurate owner-

occupancy representations because the offering materials made clear that they were merely

repeating what the borrowers said.  But plaintiffs allege that defendants knew that borrower

fraud was rampant and nonetheless made false disclosures in the offering materials.  They

contend that the due diligence reviewers looked for and reported signs of borrower fraud to

defendants.  Clayton witnesses allegedly confirmed that they would alert their clients to signs of

borrower fraud to their clients.  (Compl. ¶ 528.)

Plaintiffs also allege that their forensic statistical sampling showed that the offering

materials understated the percentage of owner-occupied properties backing the certificates by

13.86%, an amount that does suggest defendants knew about borrower fraud or were at least

willfully blind to it.  (Compl. ¶ 526.)  Finally, the Federal Housing Finance Agency reviewed

loan files backing one of the offerings here and found instances of obvious borrower fraud.  For

example, one loan for an Ohio residence was obtained by a Florida state employee who tendered

a Florida address; the loan went into default for nearly the entire $90,000 principal.  (Compl.

¶ 538.)

      d.  <u>Appraisals, LTV/CLTV Ratios</u>

Plaintiffs use a similar array of sources to plead that defendants had knowledge of the

appraisal and LTV/CLTV misrepresentations.  For example, Clayton allegedly provided to

Credit Suisse, on a daily basis, specific information about appraisal problems in the loans. (Compl. ¶ 504.)  A Clayton witness said that defendants occasionally used the same AVM as plaintiffs to test appraised values and, thus, should have uncovered the same inconsistencies as plaintiffs did.  (Compl. ¶¶ 500–02.)  Internal emails recited in the complaint indicate that certain Credit Suisse employees were aware of appraisal fraud during the relevant time period.  "For example, one e-mail chain between Credit Suisse employees references a loan securitized by Defendants in which the appraiser was paid 'to look at the wrong house.'"  (Compl. ¶ 519.) Such allegations lead to the reasonable inference that defendants regularly kept an eye out for appraisal fraud and thus would have uncovered the alleged misrepresentations.

e.  Transfer of Title

Defendants were responsible for several steps in the securitization process, which necessitated the proper transfer of title.  On that basis alone, plaintiffs have plausibly alleged that the alleged title-transfer misrepresentations in the offering materials were made knowingly.

f.  Credit Ratings

Plaintiffs allege that defendants knew that they would cause false credits ratings to be assigned to the certificates by providing ratings agencies with inaccurate information.  Initially, it is hard to believe that defendants would fail to appreciate that the input they gave the agencies would not have a bearing on the agencies' output.  Plaintiffs allege that the agencies provided their ratings models to clients on occasion, which gave securitizers insight into what features would generate high ratings.  (Compl. ¶ 544.)  And plaintiffs point to Congressional documents that purport to show Credit Suisse improperly pressured ratings analysts to give high ratings. (Compl. ¶ 217.)  Such conduct strongly indicates that defendants knew they wielded influence over the certificates' ratings.

3.  Plaintiffs Have Adequately Pleaded Reasonable Reliance

Defendants assert that plaintiffs cannot claim to have relied on the offering materials when making their decision to purchase the certificates.  (Defs.' Moving Br. 28–29.)  They point to plaintiffs' allegation that they "fully explored all information made available to investors before purchasing RMBS," including visiting originators' offices and attending industry conferences."  (Compl. ¶ 557.)  In light of their independent due diligence, defendants contend, plaintiffs should "'be deemed to have relied on [their] own investigation and [ ] be charged with knowledge of whatever [they] could have discovered by a reasonable investigation.'"  (Defs.' Moving Br. 28 (citing *DSK Enters., Inc. v. United Jersey Bank*, 189 N.J. Super. 242, 251 (App. Div. 1983)).)  They assert that the offering materials were replete with risk disclosures.  (Defs.' Reply Br. 13–14.)  At argument, defendants emphasized that Prudential is a sophisticated investor that fully understood the mechanics of the RMBS market and its concomitant risks.  (Tr. MTD Hrg. 7:2–11.)

But plaintiffs allege repeatedly that they were unable to "discover[ the fraud] by a reasonable investigation" because they did not, and still do not, have access to the source loan files.  Moreover, the technology that allowed them to conduct the forensic statistical analysis was not available when they made the purchases.  (Compl. ¶ 137.)  Thus, the fact that plaintiffs made a reasonable investigation does not categorically bar their fraud claim.  *Cf. Marino v. Marino*, 200 N.J. 315, 341–42 (2009).

Defendants also argue on the issue of reliance that plaintiffs continued to purchase certificates in late 2008, "*long after* the problems in the subprime market, including widespread delinquencies, bankruptcies of originators, and claims of origination fraud, were front-page news."  (Defs.' Moving Br. 29 (emphasis in the original).)   They do not appear to argue, however, that plaintiffs' reliance on *the statements that defendants made* was unreasonable, which would be a damaging argument that implies those statements were obviously

30

untrustworthy.  Rather, defendants argue that it is implausible that plaintiffs did in fact rely on the offering materials at that late date, which may raise a factual issue but does not persuade on a motion to dismiss.  Plaintiffs received the offering materials and it is plausible that they relied on them when making their decisions to purchase the certificates.

### 4.  Plaintiffs Have Adequately Pleaded Loss Causation/Damages

Plaintiffs seek damages or rescission because the certificates are "unmarketable at anywhere near the prices Prudential paid."  (Compl. ¶ 566.)  They would be more valuable if they possessed the characteristics described in the offering materials because fewer loans would be in default or delinquency.  (Compl. ¶ 567.)

Defendants argue that the financial crisis is the cause of the plaintiffs' losses.  They rely on *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005), where the Second Circuit concluded that "when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases."  *Id.* at 174 (internal quotation marks and citation omitted).  The plaintiff must make allegations, the court continued, "which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events.'"  *Id.* (citation omitted).  The court made clear, however, that plaintiffs' burden was to "allege [] facts sufficient to support an inference that it was defendant's fraud—*rather than other salient factors*—that proximately caused plaintiff's loss."  *Id.* at 177 (emphasis added).  It did not say that lawsuits like this one are precluded.   And consistent with *Lentell,* plaintiffs do allege facts that they suffered loss because of the fraud.  They assert there is a value gap between where the certificates are now and where they would be if the underlying loan pools were as described.  The quantum of that gap need not be alleged with specificity in the complaint as it "is usually reserved for the trier of fact."  *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884 (3d Cir. 2000).

31

5.   Conclusion

Plaintiffs have adequately pleaded all elements of a common-law fraud claim. Defendants' motion to dismiss the claim is denied.

B.   Other Fraud Claims

In addition to common-law fraud, plaintiffs allege defendants are liable for two related counts: aiding and abetting fraud and equitable fraud.

1.   Aiding & Abetting Fraud

Plaintiffs allege that each individual defendant—Credit Suisse, DLJ Mortgage, Credit Suisse First Boston Securities Corp., and Asset Backed Securities Corp.—aided and abetted each other's fraud.  (Compl. ¶ 595.)  A person will be liable for aiding and abetting if he knows that another person's "conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other."  *State of N.J., Dep't of Treasury, Div. of Inv. ex rel. McCormac v. Qwest Commc'ns Int'l, Inc.*, 387 N.J. Super. 469, 481 (App. Div. 2006) (citation omitted).  "A claim for aiding and abetting fraud also requires proof of the underlying tort . . . ."  *Id.* at 484.

Defendants argue that this count is inadequate under Rule 9(b) because plaintiffs fail to specify what each individual defendant did and knew about the alleged fraud; rather, plaintiffs are alleged to have engaged in impermissible "group pleading." For example, plaintiffs allege that "[a]ll of the Defendants had actual knowledge of, and substantially assisted in, the fraudulent scheme[.]"  (Compl. ¶ 597.)

The Court disagrees.  To be sure, Fed. R. Civ. P. 9(b) "is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.'"  *Eli Lilly & Co. v. Roussel Corp.*, 23 F. Supp. 2d 460, 492 (D.N.J. 1998) (Greenaway, J.) (citation omitted).  But here, plaintiffs provide sufficient detail about each defendant through an exhibit to the complaint that identifies the issuer, depositor, sponsor, and underwriter for each offering.  (*See* Compl., Ex.

A.)  The complaint also describes each defendant's respective roles in the securitization process. (*See* Compl. ¶¶ 33–41.)  The plaintiffs have pleaded with sufficient particularity which defendants were involved with which offering materials and how their respective roles put them in a position to make and/or know about the misrepresentations.

### 2.  Equitable Fraud

Plaintiffs also allege that defendants committed equitable fraud, which requires the same showing as a claim for fraud, except "scienter is not at issue," and only equitable remedies are available.  *Jewish Ctr. of Sussex Cnty. v. Whale*, 86 N.J. 619, 625 (1981); *see also First Am. Title Ins. Co. v. Lawson*, 177 N.J. 125, 136–37 (2003).  Because the complaint adequately pleaded fraud, it follows that equitable fraud is also adequately pleaded.

### C.  Negligent Misrepresentation

Plaintiffs alternatively plead that defendants should be held liable for negligent misrepresentation.  Unlike fraud, which requires a showing of knowledge, negligent misrepresentation requires only "a showing that defendant negligently provided false information and that plaintiff incurred damages proximately caused by its reliance on that information." *Highlands Ins. Co. v. Hobbs Grp., LLC.,* 373 F.3d 347, 351 (3d Cir. 2004) (citation omitted); *see also H. Rosenblum, Inc. v. Adler*, 93 N.J. 32, 334 (1983) ("An incorrect statement, negligently made and justifiably relied upon, may be the basis for recovery of damages for economic loss or injury sustained as a consequence of that reliance."), *superseded by statute on other grounds as stated in Finderne Management Co., Inc. v. Barrett*, 355 N.J. Super. 197, 205–06  (App. Div. 2002).  A person cannot be held liable, however, unless he or she owed a duty of care to the plaintiff.  *Highlands*, 373 F.3d at 351.

Defendants argue that they owed no duty of care because the law does not impose such a duty between two sophisticated business entities.  (Defs.' Moving Br. 32.)  In New Jersey,

however, a "defendant may be liable (because it owes a duty) to *any reasonably foreseeable recipient* who relies on the information." *Highlands*, 373 F.3d at 351 (emphasis added) (citations omitted). Foreseeability, while necessary, is not sufficient. "Subsumed in the concept of foreseeability are many of the concerns . . . acknowledge[d] as relevant to the imposition of a duty: the relationship between the plaintiff and the tortfeasor, the nature of the risk, and the ability and opportunity to exercise care." *Carter Lincoln-Mercury, Inc., Leasing Div. v. EMAR Grp., Inc.*, 135 N.J. 182, 195 (1994).

The only New Jersey case upon which defendants rely is *Commerce Bancorp, Inc. v. BK Int'l Ins. Brokers, Ltd.,* 490 F. Supp. 2d 556 (D.N.J. 2007) (Irenas, J.), where the court dismissed a negligent misrepresentation claim brought by a bank against an insurance brokerage company. The court, however, was specific that "[t]his case simply is not a negligent misrepresentation case. This dispute involves two parties to a contract, who negotiated at arms-length to achieve the acquisition of a business." *Id.* at 564.

The *Commerce Bancorp* case is distinguishable for several reasons. First, while defendants are correct that plaintiffs are sophisticated entities adept at maneuvering in the financial markets, in the transactions at issue they were customers first and foremost. They had less information than defendants about the certificates to be purchased. Plaintiffs were the intended recipients of the offering materials, and it was foreseeable that they would rely upon them.

Moreover, even if characterizing their dealings as "arm's-length," the Court is not convinced that plaintiffs would be without a cause of action for negligent misrepresentation. In *H. Rosenblum*, the court held that the auditor "has a duty to all those whom that auditor should reasonably foresee as recipients . . . of the statements for its proper business purposes, provided that the recipients rely on the statements pursuant to those business purposes." *H. Rosenblum*, 93

34

N.J. at 352.  In an even-more-analogous situation, the state court recently denied an investment bank's motion to dismiss Prudential's negligent misrepresentation claim related to its multi-million dollar RMBS purchases.  *See Prudential Ins. Co. of Am.*, slip op. at 45.  So did the district court.  *See Prudential Ins. Co. of Am. v. Goldman, Sachs & Co.*, 2013 WL 1431680, at *9.

The Court concludes that the negligent misrepresentation claim survives the motion to dismiss.

### D.  NJRICO

Plaintiffs allege that defendants violated the NJRICO statute, N.J. Stat. Ann. § 2C:41-1. To make out a prima facie case, plaintiffs must allege "(1) the existence of an enterprise; (2) that the enterprise engaged in or its activities affected trade or commerce; (3) that defendant was employed by, or associated with the enterprise; (4) that he or she participated in the conduct of the affairs of the enterprise; and (5) that he or she participated through a pattern of racketeering activity."  *State v. Ball*, 141 N.J. 142, 181 (1995).  While closely related to its federal counterpart, the NJRICO statute is construed more broadly.  *State v. Bisaccia*, 319 N.J. Super. 1, 20–21 (App. Div. 1999) (citations omitted).

### 1.  Plaintiffs Have Adequately Pled the Existence of an Enterprise

Plaintiffs allege that each of the defendants and a non-party Credit Suisse entity formed an "enterprise" that "shared the common purpose of obtaining pecuniary gain . . . in connection with the fraudulent sale of inflated mortgage-backed securities."  (Compl. ¶ 628.)  An enterprise "includes any individual . . . partnership, corporation, . . . or group of individuals associated in fact."  N.J. Stat. Ann. § 2C:41-1(c).

Defendants take the position that New Jersey does not recognize a purely intra-corporate enterprise, devoid of individuals or foreign entities.  They rely, however, in large part on federal

law, where there is a "distinctiveness" requirement, known as the *Enright* rule, for pleading the existence of an enterprise.  Under federal RICO, "a violation . . . by a corporate entity requires an association with an enterprise that is not the same corporation." *B.F. Hirsch v. Enright Ref. Co., Inc.*, 751 F.2d 628, 634 (3d Cir. 1984).  Thus, "[i]n the Third Circuit, RICO plaintiffs cannot evade the distinctiveness requirement by pleading a corporate 'enterprise' composed of a defendant's subsidiaries, employees and agents." *Longmont United Hosp. v. St. Barnabas Corp.*, No. 06-2802, 2007 WL 1850881, at *9 (D.N.J. June 26, 2007) (Cavanaugh, J.), *aff'd*, 305 F. App'x 892 (3d Cir. 2009).

Plaintiffs contend there is no distinctiveness requirement under NJRICO because the New Jersey Legislature intended the statute to be broader in scope.  Neither party has provided cases in which a New Jersey court has specifically decided the issue of whether NJRICO applies to an intra-corporate enterprise, although at least one state court and one district court have refused to dismiss similar NJRICO claims levied by Prudential against other investment banks. *See Prudential*, 2013 WL 1431680, at *10; *Prudential Ins. Co. of Am. v. J.P. Morgan*, slip op. at 52.  The weight of authority is that there is no distinctiveness requirement in New Jersey. *In re Refco Inc. Sec. Litig.*, 826 F. Supp. 2d 478, 533 (S.D.N.Y. 2011); *Ford Motor Co. v. Edgewood Props., Inc.*, No. 06-1278, 2009 WL 150951, at *11 (D.N.J. Jan. 20, 2009) (Salas, M.J.); *Maxim Sewerage Corp. v. Monmouth Ridings*, 273 N.J. Super. 84, 96 (Ch. Div. 1993).  This Court previously denied a motion to dismiss the claim on that ground, *New Jersey Reg'l Council of Carpenters v. D.R. Horton, Inc.*, No. 08-1731, 2011 WL 4499276, at *10 n.3 (D.N.J. Sept. 27, 2011).  At this point in the litigation, the Court remains satisfied that New Jersey would recognize an intra-corporate enterprise in conjunction with an NJRICO claim, and it will not dismiss.

2.  Plaintiffs Have Adequately Pleaded that the Alleged Conduct Affected Trade
or Commerce in New Jersey

Defendants assert that plaintiffs have not plausibly pleaded that the alleged enterprise engaged in, or that its activities affected, trade or commerce in New Jersey.  Their position hinges upon the fact that certain of the plaintiffs and all of the defendants reside in states other than New Jersey, and so the allegations are about interstate conduct.  (Defs.' Moving Br. 36.)  Residency is not the dispositive question, however, and defendants have not cited any cases that stand for the proposition that NJRICO is unavailable to plaintiffs when the complained-of conduct reaches beyond New Jersey.  Rather, the cases upon which they rely make the point that NJRICO *may* be unavailable when the alleged "conduct [] affects *only* interstate trade or commerce or trade or commerce in other states."  *State v. Casilla*, 362 N.J. Super. 554, 565 (App. Div. 2003) (emphasis added).  Thus, in *Casilla*, the court reversed a defendant's NJRICO conviction when the prosecution offered no evidence that the defendant's racketeering conduct affected trade or commerce in New Jersey *at all*.  *Id.* at 565–66.  The critical question is whether "the target enterprise [had] an effect on the commerce of the state."  *State v. Passante*, 225 N.J. Super. 439, 445 (Law Div. 1987).  Here, plaintiffs allege that the offering materials were sent to New Jersey, they or their investment managers relied on those materials in making investment decisions here, the purchases were made here, and New Jersey residents were injured through defendants' conduct.  (Compl. ¶¶ 32, 637.)  Those allegations are sufficient.

### 3.  Plaintiffs Have Adequately Pled a Predicate Act

"Racketeering activity" is defined by statute as at least two incidents of specified illegal conduct.  N.J. Stat. Ann. § 2C-41-1(a).  Plaintiffs allege that defendants were engaged in several forms of racketeering conduct, namely violations of the New Jersey Uniform Securities Act, Deceptive Business Practices, Theft by Deception, and Falsifying Records.  (Compl. ¶¶ 632–51.)

Predicate acts "that consist of acts of fraud must be pled with sufficient particularity under Fed. R. Civ. P. 9(b)."  *A-Valey Engineers, Inc. v. Bd. of Chosen Freeholders of Cnty. of*

*Camden*, 106 F. Supp. 2d 711, 715 (D.N.J. 2000) (Brotman, J.).  Defendants make the same argument that they raised in connection with their aiding and abetting defense, namely that plaintiffs fail to identify which defendant is responsible for which predicate acts and instead lump all defendants into a group. There are limits to what can be sorted out at this stage of the litigation, however, and as a practical matter, enough has been pleaded about each defendant's role in the securitization process, and the identification of each offering with which each defendant was involved, for the NJRICO claim to survive. For the same reasons that the Court finds the aiding and abetting claim to be adequate—namely, the description of each defendant's role in the securitization process and the identification of each offering with which each defendant was involved—it concludes that plaintiffs have sufficiently pled this element of their NJRICO.

### 4.   Plaintiffs Have Adequately Pleaded an NJRICO Conspiracy Claim

Finally, plaintiffs allege that defendants conspired to violate NJRICO, a separate statutory offense.  *See* N.J. Stat. Ann. § 2C:41-2(d).  Citing to cases that construe federal law, defendants argue that New Jersey does not recognize intra-corporate conspiracies.  (Defs.' Moving Br. 39.)  They have not pointed the Court to any New Jersey cases that stand for this proposition.  The Court has already held that an enterprise can comprise corporate affiliates.  It thus follows that the participants in that enterprise are able to conspire with one another.  The Court will not dismiss the NJRICO conspiracy claim on this motion.

## V.   Conclusion

For the reasons set forth above, defendants' motion to dismiss is denied.  An appropriate order will issue.

September 30, 2013                                    /s/ Katharine S. Hayden
                                                      Katharine S. Hayden, U.S.D.J

38